FLYNN, Administrator, Respondent, vs. THE EASTERN RAILWAY COMPANY OF MINNESOTA, Appellant.

*September 27 — October 25, 1892.*

*Railroads: Killing of person at crossing: Contributory negligence: Highways.*

Plaintiff's intestate was killed while crossing defendant's tracks at a point where, for a long time, people had been crossing in large numbers daily without objection by defendant. The place was in constant use by the company as part of its switching yards, and there were generally several trains on the tracks completely blocking the crossing, but the people were accustomed to crawl under, through, or between the cars. The deceased, who was familiar with the crossing, was attempting to pass through a narrow opening between cars standing on the crossing, and was crushed by their coming together. If she had looked she could have seen the

cars, by the impact of which the opening was closed, coming down the track. Beyond the opening the way was blocked by several solid trains, and there was nothing to indicate that the opening was left to allow people to pass through it. *Held* that, whether the crossing was a legal highway or not, the deceased was guilty of contributory negligence preventing a recovery.

APPEAL from the Circuit Court for *Douglas* County.

This action was brought to recover damages for injuries which resulted in the death of Annie Flynn, plaintiff's intestate, alleged to have been caused by the defendant in the negligent operation of its trains in the city of Superior, December 6, 1890. The defendant owned a right of way, and operated said railroad tracks upon the same, in the city of Superior, which intersected and extended across at right angles a certain way in said city commonly known as "Belknap Street." At the time of the accident it had fourteen tracks on said right of way, extending across said Belknap street at right angles and parallel with each other. The space between the tracks was eight feet, and from center to center thirteen feet. Most of these tracks were constructed in 1888, and they comprised, as a matter of fact, a part of the defendant's yards, and were in constant use by the defendant in the operation of its railroad, either for the storing of cars or the making up of trains and switching and transferring of cars from one track to another.

It was a matter of dispute between the parties as to whether the evidence showed that the way or road which has been referred to, commonly called "Belknap Street," was in fact a legal highway, or whether it was simply a place where people were accustomed to cross and recross without right, but without objection on the part of the railroad company. The remaining facts in the case are practically undisputed.

The fourteen tracks in question ran nearly north and

Flynn vs. The Eastern R. Co. of Minnesota.

south, and Belknap street crossed them almost at right angles. The main and business portion of the city of Superior lies several blocks east of these tracks. About a mile west of the tracks is located the plant of the West Superior Iron & Steel Company, at which plant, at the time this accident happened, several hundred men were employed, many of whom lived in the immediate vicinity of the plant. The way or road known as " Belknap Street " afforded the nearest communication with the city of Superior for a large part of the people who resided near the steel plant. Two other streets afforded communication with the city, to wit, Winter street, one half mile north, and Twenty-First street, one half mile south, of Belknap street. It very clearly appears from the evidence that from the time these tracks were put down, in 1888, up to and after the time of this accident, the tracks of the defendant at this way, called "Belknap Street," were crossed by people going to and from the steel plant in large numbers daily, and that the railroad company had never stopped such practice, nor erected any fence to stop it. But it appeared also that the company kept upon such tracks, almost constantly, trains of cars completely blocking the alleged way, and that there were generally half a dozen or more of such trains standing completely across said crossing, and that it was the custom of people crossing the tracks at that place to crawl through, under, and between the cars in order to make such crossing. The crossing was not planked, nor in any way prepared for the passage of teams, nor had any sidewalks been constructed on either side.

The deceased lived at or near the steel plant at the time of the accident. She and her sister, Abbie Flynn, left home together December 6, 1890, and went to West Superior, crossing at Winter street. They started to return home about half past 4 o'clock in the afternoon, and at-

tempted to use Belknap street on their return. As has been said, the tracks at the intersection of Belknap street ran north and south, and were straight, and the view of them was unobstructed, for a long distance. The first track which the deceased reached on her return home was the main track, and no cars were standing thereon. The next three tracks were also free from cars at the crossing and for a long distance north and south. It clearly appears that the next five or six tracks, at least, were full of cars standing on the crossing and extending beyond it north and south. As the deceased and her sister approached the crossing from the east on their way home, the first cars they came to, as they attempted to cross, were standing on the fifth track. The train standing on this track was composed of somewhere from thirty to fifty cars, and occupied the whole crossing, with the exception that there was an opening between two of the cars, somewhere about the middle of the crossing, which opening is variously estimated by the witnesses as from twenty inches to five or six feet wide. Abbie Flynn testifies that she and the deceased stopped and looked as they approached this opening, and saw no engine or cars moving either to the north or to the south; that she then went through this opening safely, and that her sister followed her, but that, while her sister was passing through, the cars came together with great force, and closed the opening, whereby her sister was crushed and killed.

It appears from other evidence that in the course of switching in the yard it had become necessary to take out from the train standing on the fifth track a refrigerator car, and set it off onto another track in another part of the yard, and that for this purpose a part of the train, including the refrigerator car, had been hauled south to the switch at Twenty-First street, and the refrigerator car there set off onto another track, and that the remaining cars were then

run back on track number five, and allowed by their own momentum to run down to the main body of the train from which they had been detached. As these cars came down the track, and struck the main body of the train, the cars left standing were moved several feet, and the opening between the cars, through which deceased was then attempting to pass, was closed, and she was crushed between them and killed. A brakeman accompanied this section of the train as it came back, and made the coupling as it reached the part of the train which had been left standing. It was daylight when the accident happened, and the day was clear. The deceased had frequently crossed these tracks at this place.

A motion to direct a verdict for the defendant, on the ground that no evidence showing negligence on the part of defendant had been produced, and that the evidence shows contributory negligence on the part of the plaintiff, was overruled, and a motion to direct a nonsuit on the same ground was overruled, and an exception was taken to each ruling. In addition to a general verdict for the plaintiff, the jury also returned a special verdict, wherein they found, in answer to appropriate questions, (1) that there was a want of ordinary care on the part of the defendant in the moving of its trains; (2) that such want of ordinary care was the proximate cause of the injuries to the intestate; and (3) that there was no want of ordinary care on the part of the intestate which contributed to the accident. From judgment for the plaintiff, entered upon the verdict, the defendant appeals.

For the appellant there was a brief by *Scott & Remington* and *James Spencer*, attorneys, and *M. D. Grover*, of counsel, and oral argument by *Mr. Spencer*. To the point that plaintiff's intestate was guilty of contributory negligence, they cited *Chicago, R. I. & P. R. Co. v. Houston*, 95 U. S. 697; 2 Rorer, Railroads, 1130; *Howard v. K. C., F.*

Flynn vs. The Eastern R. Co. of Minnesota.

*S. & G. R. Co.* 37 Am. & Eng. R. Cas. 552; *O'Mara v. D. & H. C. Co.* 18 Hun, 192; *Lewis v. B. & O. R. Co.* 38 Md. 588, 17 Am. Rep. 521; *Hudson v. W. W. R. Co.* 101 Mo. 13; *Lake Shore & M. S. R. Co. v. Pinchin*, 112 Ind. 592; *Owens v. H. R. R. Co.* 35 N. Y. 518; *Penn. R. Co. v. Henderson*, 43 Pa. St. 449; *McGrath v. N. Y. C. & H. R. R. Co.* 59 N. Y. 468; *Robinson v. F. & W. R. Co.* 7 Gray, 92; *Hinckley v. Cape Cod R. Co.* 120 Mass. 257; *Williams v. C., M. & St. P. R. Co.* 64 Wis. 1; *Moore v. P., W. & B. R. Co.* 108 Pa. St. 349; *Penn. R. Co. v. Bell*, 122 id. 58; *Maryland v. P. & L. E. R. Co.* 123 Pa. St. 487; *Gurley v. Mo. P. R. Co.* 104 Mo. 211; *Woodward v. N. Y., L. E. & W. R. Co.* 106 N. Y. 369; *Hass v. C. & N. W. R. Co.* 41 Wis. 44; *Kearney v. C., M. & St. P. R. Co.* 47 id. 145; *Langhoff v. M. & P. du C. R. Co.* 23 id. 43; *Sutton v. N. Y. C. & H. R. R. Co.* 66 N. Y. 248; *Ill. Cent. R. Co. v. Godfrey*, 71 Ill. 500; *Mitchell v. C. & G. T. R. Co.* 51 Mich. 238; *Beisiegel v. N. Y. C. R. Co.* 40 N. Y. 9; *Wright v. B. & A. R. Co.* 142 Mass. 296; *Grippen v. N. Y. C. R. Co.* 40 N. Y. 34.

*T. F. Frawley* and *Alexander Athey*, for the respondent, contended, *inter alia*, that the question of contributory negligence was properly submitted to the jury. *Langhoff v. M. & P. du C. R. Co.* 19 Wis. 489; *Spencer v. M. & P. du C. R. Co.* 17 id. 488; *Townley v. C., M. & St. P. R. Co.* 53 id. 626; *Davis v. C. & N. W. R. Co.* 58 id. 646; 1 Shearm. & Redf. Neg. sec. 11; *Beisiegel v. N. Y. C. R. Co.* 40 N. Y. 9; *West Chester & P. R. Co. v. McElwee*, 67 Pa. St. 311; *Detroit & M. R. Co. v. Van Steinberg*, 17 Mich. 99; *Park v. O'Brien*, 23 Conn. 347; *Briggs v. Taylor*, 28 Vt. 183; *Mulligan v. Curtis*, 100 Mass. 512; *Gaynor v. O. C. & N. R. Co.* id. 208; *Detroit & M. R. Co. v. Curtis*, 23 Wis. 152; *Johnson v. Bruner*, 61 Pa. St. 58; *Quirk v. Holt*, 99 Mass. 164; *Snow v. H. R. Co.* 8 Allen, 441; *Fox v. Sackett*, 10 id. 535; *Griggs v. Fleckenstein*, 14 Minn. 81; *Kennayde v. P. R. Co.* 45 Mo. 255; *Hanover R. Co. v. Coyle*, 55 Pa. St. 396.

Flynn vs. The Eastern R. Co. of Minnesota.

WINSLOW, J. It is unnecessary to decide whether the evidence was sufficient to prove that "Belknap Street," so called, was a legal highway at the crossing where the accident happened. Whether it was a highway, or whether the railway company had simply licensed people to cross its tracks and cars as best they could, is not material in the view which we take of the case. In either event the law imposed on the deceased the duty of exercising ordinary care in attempting to cross the tracks. If the court must say, upon the facts presented, that the deceased did not exercise ordinary care, and that as a consequence thereof she was killed, no discussion of the question of the existence of a legal highway or of the degree of care required of or exercised by defendant's servants is necessary. The evidence seems to our minds to demonstrate very clearly that the deceased was guilty of contributory negligence which must defeat a recovery, whatever may have been the negligence of the defendant.

It appears beyond doubt that the crossing had never been prepared for travel; that it had been used since 1883 as a part of the switch yards of the company; that it was always obstructed to a greater or less degree with trains of standing freight cars, frequently as many as half a dozen in number, and sometimes more; that no attempt was made to leave passageway for travelers; that openings were sometimes left, but apparently merely accidentally and not intentionally; that people who crossed were generally compelled to crawl under or climb between cars, or pass through them upon extemporized bridges; that switching and moving of cars was liable to take place at any time,— in short, that the railway company always treated it as simply a part of their switching yard, for the transaction of their business. It also appears that the deceased had frequently crossed the tracks at this crossing; that she had lived near the steel plant for some time; that her husband

had been in the employ of the company and had charge of these tracks for thirteen or fourteen months before this accident; that she must have well known the facts as to the use of these tracks and the danger incurred in crossing them.    She was an adult, in full possession of her faculties, and when she reached the place of the accident it was daylight.    She could see that, beyond the opening through which she passed, the way was blocked by several solid trains of freight cars.    Under these circumstances, the opening could not be construed by any reasonable person as an invitation to pass through it.    There was nothing to indicate that the opening had been made to accommodate travelers, because the way was completely blocked by five or six other trains.    Had she got safely through the opening, she knew that there were several trains which she would have to crawl under or pass through in some equally hazardous method.    With the knowledge she had of the use constantly made of these tracks, and with the obstructions which she could not help seeing before her, it seems to us that the attempt to pass through the narrow space where she was crushed was nothing short of foolhardy.    Had she been crushed while crawling under a car, no one would contend that she was exercising ordinary care.    It is difficult to see wherein her passing through this narrow opening was materially different.    Had she carefully looked before entering the gap, she could have seen the detached cars coming down the track, because the view was clear and unobstructed.    If she did see them coming, and attempted to cross, she voluntarily assumed the risk; if she did not look, or looked so carelessly as not to observe what was plainly visible, she was negligent.    In either case no recovery can be had.

The citation of adjudicated cases does not help in consideration of the question.    No two cases are alike in their facts.    Upon the facts of this case we must hold that the

deceased was guilty of negligence in entering the gap between the cars, which must prevent a recovery.

*By the Court.*— Judgment reversed, and cause remanded for a new trial.